UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| | * | |
| LOUIS A. FERRARO, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 20-cv-11652-ADB |
| | * | |
| TELIA CARRIER U.S., INC., and BRIAN | * | |
| MCHUGH, | * | |
| | * | |
| Defendants. | * | |
| | * | |

**MEMORANDUM AND ORDER ON
PARTIAL MOTIONS FOR SUMMARY JUDGMENT**

BURROUGHS, D.J.

Louis A. Ferraro ("Plaintiff") brings this action against Defendants Telia Carrier U.S., Inc. ("Telia") and its president Brian McHugh ("McHugh," together with Telia, "Defendants"), alleging that Defendants misclassified him as an independent contractor and therefore underpaid him in violation of the Massachusetts Wage Act ("MWA").

Currently before the Court is Plaintiff's motion for summary judgment on his claim that he was misclassified as an independent contractor, [ECF No. 38], and Defendants' motion for summary judgment on the wage and overtime claims, [ECF No. 40].  For the reasons set forth below, both motions are DENIED.

I.      **BACKGROUND**

    A.      **Factual Background[1]**

        1.      <u>The Service Agreement</u>

Telia is the U.S. arm of an international telecommunications company that provides an "internet backbone" to network operators and content providers.  [ECF No. 44 ¶ 1].  Telia's business includes the marketing and selling of its products and services.  [ECF No. 45 ¶ 3].

In or around March 2013, Plaintiff reached out to Ivo Pascucci ("Pascucci") about job openings at Telia.  [ECF No. 45 ¶ 12].  At the time, Pascucci was Telia's Head of North America Sales.  [ECF No. 44 ¶¶ 4–5].  Plaintiff and Pascucci had worked together in the past, and Pascucci knew that Plaintiff "sold well[.]"  [ECF No. 45 ¶ 13].  According to Plaintiff, Pascucci told him there were no job openings, "but they would try to get him in the door as quickly as possible by classifying him as an independent contractor."  [Id.].  Defendants, for their part, say only that "Pascucci discussed with [Plaintiff] the possibility of setting up an independent contractor relationship based on [Plaintiff's] prior experience working as an independent contractor." [2]  [Id.].  Thereafter, on April 29, 2013, Telia executed a Service Agreement (or "the

---

[1] Unless otherwise indicated, the facts are drawn primarily from Plaintiff's rebuttal to Defendants' Local Rule 56.1 statement, [ECF No. 44], and Defendants' rebuttal to Plaintiff's Local Rule 56.1 statement, [ECF No. 45], which contain both parties' positions on the material facts, and all documents referenced therein.  Citations to paragraph numbers refer to both the asserted fact and the response.

[2] Pascucci testified as follows:

    At that time we did not have open head count to hire anybody. So at that time, I said to [Plaintiff], I don't have any open positions. I can't hire anyone. But we had some experience in the past, at TI Net, you know, where we were contractors. And that's when [Plaintiff] and I -- Again, I can't recall specific details. But I can say that, you know, we discussed, you know, possibly setting up the same, you know relationship like we had at TI Net, which, you know, where [Plaintiff] would be a

Agreement") with Louis A. Ferraro, LLC (or the "LLC"), an entity organized by Plaintiff. [ECF No. 44 ¶ 2; ECF No. 45 ¶ 15].[3]

Plaintiff first formed an entity called Louis A. Ferraro, LLC in October 2008 for the purpose of his engagement as an independent contractor for another company, Tinet, [ECF No. 44 ¶ 6], though Defendants dispute his motivations for creating the entity, [id.]. Tinet told Plaintiff that he had to be an independent contractor. [ECF No. 45 ¶ 6]. Nevertheless, Plaintiff worked full-time for Tinet as a Global Sales Manager. [ECF No. 44 ¶ 6]. Once Tinet was acquired by another company, Plaintiff became a W2 employee and he terminated the original Louis A. Ferraro, LLC on or about July 13, 2011. [ECF No. 44 ¶ 6; ECF No. 45 ¶ 11]. Plaintiff said he first formed Louis A. Ferraro, LLC "[s]o that I can protect myself. Because I was an independent contractor, in case I got sued or something happened, they wouldn't take my house or whatever. That's the sole purpose of that, why I formed it . . . . It was my idea." [ECF No. 46-5 (Ferraro Dep.) 28:13–23].

On or about April 19, 2013, Plaintiff again formed an entity called Louis A. Ferraro, LLC allegedly "for the sole and exclusive purpose" of his engagement with Telia, though Defendants dispute that was his only intent. [ECF No. 44 ¶ 6; ECF No. 45 ¶ 14].[4] The LLC's Certificate of

---

contractor. And then, you know, market and sell Telia data services in North America.

[ECF No. 45 ¶ 13].

[3] Plaintiff states, and Defendants do not dispute, that McHugh also played some role in his hiring, though the extent of that role is unclear. Plaintiff describes McHugh as Telia's Chief Executive Officer, but Defendants identify him as Senior Legal Counsel and President of Telia U.S. (which, for the purposes of this order, is Telia). [ECF No. 44 ¶ 4; ECF No. 45 ¶ 4].

[4] Plaintiff testified that when he reformed the LLC, he "copied" the information he had when he originally formed it "and sent it in and started up again." [ECF No. 46-5 (Ferraro Dep.) 34:18–19].

Organization states that "[t]he general character of the business of the LLC is to provide advice and consulting on telecommunications and information technology; to engage in any activities directly or indirectly incidental or related thereto . . . ." [ECF No. 44 ¶ 12; ECF No. 42-8 at 2]. Plaintiff asserts, and Defendants dispute, that Defendants understood they were contracting for Plaintiff's individual services when entering the Agreement. [ECF No. 45 ¶ 17]. According to McHugh, Defendants "engaged Louis Ferraro, LLC, but [Plaintiff] was the interface that we were working with." [Id. ¶ 17; ECF No. 45-1 (McHugh Dep.) 49:1–7)].

Plaintiff received a monthly mixed fee of $9,433 and quarterly performance bonuses until the parties amended the Agreement in January 2018 to increase his monthly fee to $9,600. [ECF No. 44 ¶¶ 8–10]. Plaintiff asked Pascucci more than once about potentially changing his status to an employee, but the request "didn't go anywhere[.]" [ECF No. 45 ¶ 22]. On the other hand, in or around May 2018, Ferraro also told Stephen Hartman ("Hartman") that he "enjoyed the current arrangement." [Id. ¶ 22; ECF No. 39-9 (Hartman Dep.) 20:13–22].[5] Hartman was the Head of North America Sales who was responsible for managing sales teams handling accounts in the US and Canada. [ECF No. 45 ¶¶ 47–48].

The Agreement was ultimately terminated in November 2019 because Telia leadership had received complaints that Plaintiff "berated other team members, refused to follow the

---

[5] Recalling a conversation with Plaintiff, Hartman testified:

> We discussed basically the terms of his current agreement and whether he wanted, was looking to pursue permanent employment or some type of increase to his current contract. And he communicated that he enjoyed the current arrangement, but he would like an increase. And I submitted the information to [McHugh] who updated his contract on June 14, 2018, to take effect back to January, that showed the new terms and incremental increases to his pay.

[ECF No. 39-9 (Hartman Dep.) 20:13–21:1]

procedures set forth by operations, and caused several complaints from clients." [ECF No. 44 ¶¶ 37–38]. Plaintiff has refuted these allegations in a separate proceeding. [Id. ¶ 37].

### 2. Services Performed

Pursuant to the Agreement, Plaintiff agreed to be a "Supplier" for Telia to market and promote the sales of its communication services in North America. [ECF No. 44 ¶ 3]. Appendix One to the Service Agreement lists the following under "Description of Services":

> During the term of the Agreement, Supplier shall provide the services described below to TeliaSonera[6].
>
> - market and sell TeliaSonera's products to customer prospects approved by TeliaSonera in the North American market.
> - obtain new customers for TeliaSonera and develop existing relationships with customers of TeliaSonera.
> - perform the administration, marketing and sales representation services requested by TeliaSonera and ensure that all accounts assigned to Supplier are managed properly. Supplier shall work with personnel of TeliaSonera to address any issues relating to the sales cycle, including the preparation of bids, the design of solutions, execution of Agreements and Orders, the processing of orders, the implementation of services, the billing of services, the resolution of faults, the operation and repair of services, TeliaSonera queries, etc.

[ECF No. 44 ¶ 13; ECF No. 45-3 at 9]. The Agreement required that any "personnel providing services under th[e] Agreement" "shall . . . work solely in providing Services to [Telia], and . . . shall not engage any employment or business activity other than for [Telia]." [ECF No. 45 ¶ 16; ECF No. 45-3 at 2–3]. It also required that any "personnel used to provide Service to [Telia] . . . will remain under the control and subordination of Supplier at all times." [ECF No. 45-3 at 2–3; ECF No. 44 ¶ 36].

---

[6] Prior to 2016, Telia was named TeliaSonera International Carrier, Inc. [ECF No. 45 at 1 n.1].

Plaintiff's engagement with Telia lasted a little over six years, from around April 2013 to around November 2019.  [ECF No. 45 ¶ 18].  During that time, Plaintiff provided full time-services, reported to and worked with Telia employees.  [Id. ¶ 19].  Plaintiff did not provide services to any other entity while he was under contract with Telia.  [Id. ¶ 23].

Plaintiff worked out of his home in Massachusetts and his primary responsibility was sales.  [ECF No. 44 ¶¶ 14–16].[7]  He traveled "about four times a year" to conferences to meet current and prospective clients, but the rest of his work was mostly done by phone.  [Id. ¶¶ 17–24].  Telia reimbursed his travel expenses.  [Id. ¶ 25].

Since at least 2003, Telia has employed sales employees.  [ECF No. 45 ¶ 27].  In the period from 2017 to 2019, Telia had anywhere from 47–78 employees each year and 8–9 were sales employees.  [Id. ¶¶ 25, 28].  Of those total sales employees, 12 to 18 were "sales representatives" with the "Account Manager" title.  [Id. ¶¶ 30–32].  During the relevant time period, Telia had contracted with at least two other independent contractors to perform sales services[8], [ECF No. 44 ¶ 7], but, after 2013, all new sales representatives were classified as employees, [ECF No. 45 ¶ 37].  Plaintiff was issued a "Data Sales Incentive Plan" for 2019 that provided information on how Telia would award its staff for value generated.  [ECF No. 44 ¶

---

[7] Most of the sales representatives work remotely, though Defendants assert that more employees worked from offices prior to the COVID-19 pandemic.  [ECF No. 45 ¶ 34].

[8] The two other individuals classified as independent contractors were Edison De Leon ("De Leon") and Luis Velasquez ("Velasquez").  Plaintiff contends that, unlike De Leon and Velasquez, whose worked targeted Latin America, he was the only person doing sales for Telia in North America on an independent contractor basis.  Defendants dispute that fact, contending that both of these individuals also conducted sales in the US to some degree,  [ECF No. 44 ¶ 7], but elsewhere admit that Hartman did not supervise De Leon and Velasquez because he was responsible only for "the sales team and the sales support team who handle accounts in North America and Canada[,]" [ECF No. 45 ¶ 49].

11]. The plan referred to Plaintiff as an "Account Manager" and he signed the plan under a line that said "Signed by Employee[.]" [ECF No. 45 ¶ 20; ECF No. 39-11 at 7].[9]

Telia sales representatives are, at least in part, responsible for selling to customers to generate "an increase in revenue, in sales[,]" [ECF No. 45 ¶ 32], but their range of duties can be broader.[10] Plaintiff asserts that his principal duties were no different from those of the sales representatives Telia classified as employees, but Defendants claim that "Account Managers" "were less focused on bringing new customers in and they were focused more on maintaining business" and that [Plaintiff's] focus "was very much to go out and be a hunter and to identify new customers for [Telia]." [Id. ¶ 35; ECF No. 45-1 (McHugh Dep.) 35:4–11; ECF No. 44 ¶ 30].

### 3.   Supervision and Control

Both Pascucci and Hartman supervised Plaintiff, [ECF No. 44 ¶ 36], and Plaintiff avers that they supervised him no differently from how they supervised the sales representatives that were classified as employees, [ECF No. 45 ¶¶ 44, 52]. The parties dispute the extent of that supervision and how much freedom Plaintiff had in how he handled clients.

---

[9] Defendants state that they did not create separate plans for their independent contractors. [ECF No. 45 ¶ 20].

[10] McHugh provided the following testimony:

   Q. What are the duties of an account manager?

   A. So a sales representative is responsible for identifying prospective customers, for introducing themselves and the company to the prospective customer, for identifying potential needs that we might be able to fill for the customer, to establishing a relationship with the customer, to on-boarding the customer, to managing the overall relationship with the customer.

[ECF No. 45-1 (McHugh Dep.) 23:18–24:2; ECF No. 45 ¶¶ 32–33].

Plaintiff testified as follows:

> I was given a lot of latitude, I would say, to handle customers the way I wanted. I mean, there was a code of conduct and ethics for the company somewhere. I mean, I never saw it, but you have to treat a customer with -- you know, with respect, dignity. Yeah, were they telling me how to approach a customer? No. I was a professional salesperson with a lot of years' experience.

[ECF No. 44 ¶ 31; ECF No. 42-6 (Ferraro Dep.) 100:11–17].

The Service Agreement only required Plaintiff to report to Telia regarding his services "from time to time[,]" but Plaintiff reported to and had communications with Telia on a frequent basis, including communications with his direct supervisor, Pascucci, "six, seven, eight times a week, maybe more." [ECF No. 44 ¶ 35]. Additionally, part of Hartman's supervision included issuing a warning to Plaintiff about his purported violations of the company's code of conduct. [ECF No. 45 ¶ 50].

Telia contends that it provided "little assistance" to Plaintiff in obtaining new clients and that he "rarely received clients" from Telia, which Plaintiff disputes. [ECF No. 44 ¶¶ 26–27]. It is, however, undisputed that Plaintiff brought contacts to Telia that he had developed in prior experiences, [id. ¶ 28], and that Plaintiff received only "general feedback" from Telia leadership on how to sell, [id. ¶¶ 31–34].

    4.   <u>Damages</u>

Plaintiff seeks $132,000 in the value of lost benefits and $115,232 in unpaid overtime. [ECF No. 42 ¶ 42]. As to his estimate of overtime, he testified:

> For the time period relevant to this case, I estimate that I worked at least 50 hours[s] per week, and likely more. Telia did not keep records of my hours, which I understand was a violation of Massachusetts law. Telia also did not request or direct me to keep a record of my hours, so I did not do so. I am not a lawyer, so I did not know I was entitled to overtime, and therefore I had no reason to keep records of my hours.

[<u>Id.</u> ¶ 43].

### B.      Procedural Background

In September 2020, Plaintiff sued Defendants in Massachusetts state court, asserting that

Telia had misclassified him as an independent contractor under the MWA, Mass. Gen. Laws c.

149, § 148B (Count I) and that, based on this misclassification, it underpaid him in violation of

the MWA's wage and overtime provisions, Mass. Gen. Laws c. 149, § 148 (Count II) and Mass.

Gen. Laws c. 151, § 1A (Count III).  [ECF No. 1-1 at 5–6].  Defendants subsequently removed

the action to this Court.  [ECF No. 1 at 1].  On November 12, 2020, Plaintiff moved for judgment

on the pleadings as to his status as Telia's employee, which the Court denied.  [ECF No. 17 at 1;

ECF No. 34 at 1].  Plaintiff revived those arguments in his motion for partial summary judgment

on October 1, 2021.  [ECF No. 38 at 1–2].  That same day, Defendants moved for partial

summary judgment on Counts I and II.  [ECF No. 40 at 1–2].  Oppositions and replies have been

filed.  See [ECF Nos. 43, 46, 47, 48].

## II.   LEGAL STANDARD

Summary judgment is appropriate where the moving party can show that "there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a).  "[A]n issue is 'genuine' if it 'may reasonably be resolved in favor

of either party.'" Robinson v. Cook, 863 F. Supp. 2d 49, 60 (D. Mass. 2012) (alteration in

original) (quoting Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008)).  "A fact is material

if its resolution might affect the outcome of the case under the controlling law." Cochran v.

Quest Software, Inc., 328 F.3d 1, 6 (1st Cir. 2003) (citation omitted).  Thus, "[a] genuine issue

exists as to such a fact if there is evidence from which a reasonable trier could decide the fact

either way." Id. (citation omitted).  By invoking summary judgment, "the moving party in effect

declares that the evidence is insufficient to support the nonmoving party's case." United States

v. Plat 20, Lot 17, Great Harbor Neck, New Shoreham, R.I., 960 F.2d 200, 204 (1st Cir. 1992) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).

"To succeed in showing that there is no genuine dispute of material fact," the moving party must "'affirmatively produce evidence that negates an essential element of the non-moving party's claim,' or, using 'evidentiary materials already on file . . . demonstrate that the non-moving party will be unable to carry its burden of persuasion at trial.'" Ocasio-Hernández v. Fortuño-Burset, 777 F.3d 1, 4–5 (1st Cir. 2015) (quoting Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000)). Conversely, "[t]o defeat a properly supported motion for summary judgment, the nonmoving party must establish a trial-worthy issue by presenting enough competent evidence to enable a finding favorable to the nonmoving party." ATC Realty, LLC v. Town of Kingston, 303 F.3d 91, 94 (1st Cir. 2002) (internal quotation marks and citation omitted). That is, the nonmoving party must set forth specific, material evidence showing that there is "a genuine disagreement as to some material fact." Plat 20, Lot 17, Great Harbor Neck, 960 F.2d at 204 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986)).

In reviewing the record, the Court "must take the evidence in the light most flattering to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Cochran, 328 F.3d at 6 (citation omitted). The First Circuit has noted that this review "is favorable to the nonmoving party, but it does not give him a free pass to trial." Hannon v. Beard, 645 F.3d 45, 48 (1st Cir. 2011). "The factual conflicts upon which he relies must be both genuine and material[,]" Gomez v. Stop & Shop Supermarket Co., 670 F.3d 395, 397 (1st Cir. 2012) (citation omitted), and the Court may discount "conclusory allegations, improbable inferences, and unsupported speculation[,]" Cochran, 328 F.3d at 6 (quoting Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).

The Court may grant summary judgment on "each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a).

## III.   PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON COUNT I

Plaintiff seeks summary judgment on whether Telia mischaracterized him as an independent contractor. [ECF No. 38 at 1–2]. Defendants respond that there are genuine disputes of material fact that preclude summary judgment on this count. [ECF No. 46 at 6].

### A.   Legal Standard

Under the Massachusetts independent contractor statute, an individual who performs services is presumed to be an employee, unless

> (1) the individual is free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact; and
>
> (2) the service is performed outside the usual course of the business of the employer; and
>
> (3) the individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed.

Mass. Gen. Laws, c. 149, § 148B(a). "The statute presumes that a worker is an employee and requires the employer to satisfy all three prongs by a preponderance of the evidence to show that the worker is an independent contractor instead." DaSilva v. Border Transfer of MA, Inc., 377 F. Supp. 3d 74, 86 (D. Mass. 2019); see also Fine v. Guardian Life Ins. Co. of Am., No. 19-cv-30067, 2021 WL 916270, at *3 (D. Mass. Mar. 10, 2021) ("The statute requires the employer to satisfy all three prongs of the so-called 'ABC Test' by a preponderance of the evidence to show that the worker is not an employee but, instead, is an independent contractor.").

"The bar set for employers to prove that workers are independent contractors is quite demanding." Hogan v. InStore Grp., LLC, 512 F. Supp. 3d 157, 176 (D. Mass. 2021). "Courts

11

interpret the statute in a manner consistent with" its purpose "to protect workers by classifying

them as employees, and thereby grant them the benefits and rights of employment, where the

circumstances indicate that they are, in fact, employees."  DaSilva, 377 F. Supp. 3d at 86

(quoting Sebago v. Bos. Cab Dispatch, Inc., 28 N.E.3d 1139, 1146 (Mass. 2015); see also Patel

v. 7-Eleven, Inc., 183 N.E.3d 398, 403–04 (Mass. 2022).  "The fact that a putative employee has

signed an agreement classifying him as an independent contractor, rather than an employee, does

not dictate the outcome of the legal analysis."  Valle v. Powertech Indus. Co., 381 F. Supp. 3d

151, 164 (D. Mass. 2019) (citing Ruggiero v. Am. United Life Ins. Co., 137 F.Supp.3d 104, 113

(D. Mass. 2015)).  Courts recognize that "no prong should be read so broadly as to render the

other factors of the test superfluous."  Hogan, 512 F. Supp. 3d at 174–75 (citation omitted).

    **B.**    **Discussion**

        1.    <u>Business-to-Business Defense</u>

As a preliminary matter, Telia argues that the independent contractor statute is

inapplicable because the Service Agreement was signed by Louis A. Ferraro, LLC and the

protections of the MWA are only afforded to individuals.  [ECF No. 46 at 8–12].  According to

Telia, the Agreement was merely a "business-to-business relationship."  [Id.].  After careful

consideration, the Court finds that this issue cannot be determined on this record as a matter of

law.

Liability under the independent contractor statute extends to only those who "fail[] to

properly classify an individual as an employee" in accordance with the section, Mass. Gen. Laws

c. 149, § 148B(d), and the Massachusetts Attorney General has advised that it is not intended to

affect "legitimate . . . business-to-business relationships in the Commonwealth[,]" Chebotnikov

v. LimoLink, Inc., No. 14-cv-13475, 2017 WL 2888713, at *7 (D. Mass. July 6, 2017) (citing An

Advisory from the Attorney General's Fair Labor Division on M.G.L. c. 149, s. 148B, 2008/1

("Advisory 2008/1") at 5.  "However, there is no bright-line rule precluding those who contract

through incorporated entities from being employees under Massachusetts law."  Id.  Indeed, at

least one court in this district has found that "it is clear that an individual can bring a Section

148B claim even if he has incorporated his business, and the employer's formal relationship is

with the entity and not the individual."  Martins v. 3PD, Inc., No. 11-cv-11313, 2013 WL

1320454, at *16 (D. Mass. Mar. 28, 2013); see also Depianti v. Jan-Pro Franchising Int'l, Inc.,

990 N.E.2d 1054, 1065 (2013) ("[T]he lack of a contract between the parties does not itself,

without more, preclude liability under the independent contractor statute.").  Instead, courts have

determined that "[t]he inquiry is whether *in substance* the worker is an employee or a person (or

entity) acting genuinely as an independent contractor."  Chebotnikov, 2017 WL 2888713, at *7

(quoting Anderson v. Homedeliveryamerica.com, Inc., 11-cv-10313, 2013 WL 6860745, at *2

(D. Mass. Dec. 30, 2013)).  To conduct this analysis, courts have relied on the following

guidance from the Attorney General:

> The difficulty arises when businesses are created and maintained in order to avoid
> the Law. The [Attorney General's Office] will enforce the Law against entities that
> allow, request or contract with corporate entities such as LLCs or S corporations
> that exist for the purpose of avoiding the Law. In these situations, the [Attorney
> General's Office] will consider, among other factors, whether: the services of the
> alleged independent contractor are not actually available to entities beyond the
> contracting entity, even if they purport to be so; whether the business of the
> contracting entity is no different that the services performed by the alleged
> independent contractor; or the alleged independent contractor is only a business
> requested or required to be so by the contracting entity.

Advisory 2008/1 at 5; see also DaSilva v. Border Transfer of MA, Inc., 296 F. Supp. 3d

389, 402 (D. Mass. 2017) ("[I]ncorporation cannot be a shield to prevent liability under the

Wage Act.").

The Massachusetts Supreme Judicial Court (SJC) has since provided further instructions to interpret this guidance.  In Chambers v. RDI Logistics, Inc, the SJC concluded that material issues of disputed fact precluded defendant RDI Logistics, Inc.'s ("RDI") motion for summary judgment on the basis that plaintiffs (furniture delivery drivers) did not have standing under the independent contractor statute because their contracts with RDI were through corporate entities. 65 N.E.3d 1, 7, 13–15 (Mass. 2016).  There, the SJC recognized that liability under the independent contractor statue would extend to those individuals who provide services through a corporation "created and maintained in order to avoid" the statute's application and that the Attorney General factors are "material to a determination whether the corporate form represents a legitimate business-to-business relationship, or one whose raison d'etre is to prevent the classification of workers as employees[.]"  Id. at 14.  In sum, the SJC concluded that "[t]his nonexhaustive list of factors properly focuses on whether the worker's use of the corporate form was *at the worker's behest or forced upon the worker* by an employer *in order to misclassify him or her*."  Id. (emphasis added).

Following this legal analysis, the SJC then turned to the record before it.  There, "defendants urge[d] that the plaintiffs ceded standing under the independent contractor statute because they purposefully chose and financially benefited from using the corporate form[,]" whereas plaintiffs "assert[ed] that they formed companies only to be able to contract with RDI, did not perform services for any companies other than RDI, and were forbidden from performing work for any companies other than RDI."  Chambers, 65 N.E.3d at 13–14.  The court, concluding that "[t]hese allegations raise[d] the question whether the plaintiffs incorporated for their own benefit, as the defendants suggest, or whether RDI required them to incorporate in

14

order to misclassify them as independent contractors[,]" thus declined to resolve the issue at summary judgment.  Id. at 14–16.

Here, there are similar competing facts that preclude summary judgment.  Plaintiff asserts that he formed the LLC only to be able to contract with Telia, and that he did not perform work for any other business during this engagement, and was, in fact, forbidden from doing so.  He worked "full time" for Telia, performed all the work himself, worked with Telia employees, and, to some degree, was supervised by Telia employees.  But, as in Chambers, there is no evidence in the record that Telia requested or required him to set up the LLC, and there is some evidence, however tenuous, that he chose to do so "for [his] own benefit."  Chambers, 65 N.E.3d at 14.

The Court is not aware of a case since Chambers that would compel a different conclusion on these facts.[11]  In Chebotnikov, 2017 WL 2888713, at *7, the court declined to resolve at summary judgment whether there was a legitimate business-to-business relationship based on the following disputed facts:

> [T]wo of the three incorporated entities existed both prior to and after their relationship with LimoLink. There is no evidence that LimoLink requested or required that the drivers establish separate businesses to avoid the reach of the statute. Each of the three entities, to varying degrees, provided services to other entities or individuals during the time in which they contracted with LimoLink[,] . . . [but] plaintiffs performed all services for

---

[11] Prior to the issuance of the Chambers decision, the court in Martins v. 3PD, Inc. came to a different conclusion:

> [T]he Massachusetts Attorney General has addressed this specific issue, advising that Section 148B applies to employers "that allow, request or contract with corporate entities . . . that exist for the purpose of avoiding [Section 148B]." . . . 3PD contends that "there is no evidence in the record that 3PD requested or required Rocha to incorporate," but this ignores the plain language of the Attorney General Advisory, which includes the word "allow." 3PD cannot allow Mr. Rocha to incorporate and then use that incorporation as a shield for the purpose of avoiding Section 148B liability.

2013 WL 1320454, at *16.

LimoLink themselves, and did not 'farm out' LimoLink jobs to other drivers. And it is disputed whether the agreements themselves were negotiable.

Id. at *8.  While Plaintiff's argument here may have a leg up on that of the plaintiffs in Chebotnikov because he did not provide services to others in the relevant time, it is not enough to warrant summary judgment in his favor where other material factual disputes remain. [12] Compare Weiss v. Loomis, Sayles & Co., 141 N.E.3d 122, 128 (Mass. App. Ct. 2020), review denied sub nom. Weiss v. Loomis, Sayles & Co., 145 N.E.3d 887 (Mass. 2020) (reversing a trial judge's decision to grant employer's motion for directed verdict because there were disputes of facts regarding whether the worker had standing to assert a misclassification claim); with Jinks v. Credico (USA) LLC, 177 N.E.3d 509, 517 (2021) (affirming grant of summary judgment to defendant, in part, because plaintiff did not adduce any facts to show that the intermediatory corporation was set up for purpose of evading wage law obligations).

This business-to-business defense was also raised in DaSilva v. Border Transfer of MA, Inc., 377 F. Supp. 3d 74 (D. Mass. 2019), in which delivery drivers brought a class action against a property broker for misclassifying them as independent contractors.  That Court, however, found that the class members, who contracted through corporate entities, were not in a legitimate business-to-business relationship with the defendant because the defendant "only contracts with corporate entities, has the right to terminate a [contract] if a driver dissolves his corporate entity, and imposes a nonnegotiable [contract] on its drivers." Id. at 87.  In light of those facts, that court concluded that it was "of minimal relevance" that some class members were motivated by other reasons to form their corporate entities.  Id.  No such facts exist here.

---

[12] The Court is nevertheless skeptical of the persuasiveness of Defendants' argument that Louis Ferraro LLC had, in some form, preexisted the Service Agreement in manner similar to the incorporated entities in LimoLink.  [ECF No. 46 at 9].

Because the Court cannot resolve this issue on the record before it, Plaintiff's motion for summary judgment is <u>DENIED</u>.

## IV.     DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON COUNTS II AND III

Even if Count I were to ultimately be found in Plaintiff's favor, Defendants argue that Plaintiff cannot prevail as a matter of law on his claim for overtime wages under the MWA because (1) he not entitled to overtime pay because he was exempt under the "outside sales" and/or "administrative" exemptions, and (2) he has not presented sufficient evidence from which the number of overtime hours worked without compensation can be reasonably inferred.  [ECF No. 40].

### A.     Exemptions from Overtime Pay

The Massachusetts overtime law provides:

> [N]o employer in the commonwealth shall employ any of his employees . . . for a work week longer than forty hours, unless such employee receives compensation for his employment in excess of forty hours at a rate not less than one and one half times the regular rate at which he is employed.

Mass. Gen. Laws c. 151, § 1A.  The statute includes 20 enumerated exemptions, including ones for "outside salesman" and "administrative" professionals.  <u>Id.</u>  Defendants argue that Plaintiff is not entitled to overtime pay because he fell under either one of these exemptions.  Defendants have the burden of proof on this issue.  <u>See</u> <u>Goodrow v. Lane Bryant, Inc.</u>, 732 N.E.2d 289, 294 (Mass. 2000) (the defendant employer, which claimed that the plaintiff fell within an enumerated exemption to Section 1A, bore the burden of proving entitlement to the exemption); <u>see also</u> <u>Parham v. Wendy's Co.</u>, No. 14-cv-14367, 2015 WL 1243535, at *3 (D. Mass. Mar. 17, 2015).

Under Massachusetts law, Section 1A is interpreted to advance its purposes: "to reduce the number of hours of work, encourage the employment of more persons, and compensate

employees for the burden of a long workweek."  Mullally v. Waste Mgmt. of Mass., Inc., 895

N.E.2d 1277, 1281 (Mass. 2008).  Consistent with these purposes, the exemptions enumerated in

the overtime statute must be construed narrowly.  Reich v. Newspapers of New England, Inc., 44

F.3d 1060, 1070 (1st Cir. 1995).  As with all statutory exemptions to overtime pay, a particular

job must "plainly and unmistakably" fall within the "outside sales" or "administrative"

exemptions for either exemption to apply.  [Id. (citation omitted)].

Against this legal backdrop, Defendants clearly have not met their burden of showing that

Plaintiff's sales position fell plainly and unmistakably within either the "outside sales" or

"administrative" exemption of Section 1A.

      1.    Outside Sales Exemption

"Federal regulations define an outside salesman as any employee '(1) [w]hose primary

duty is: (i) making sales . . . , or (ii) obtaining orders or contracts for services or for the use of

facilities for which a consideration will be paid by the client or customer; and (2) [w]ho is

customarily and regularly engaged away from the employer's place or places of business in

performing such primary duty."  Sullivan v. Dumont Aircraft Charter, LLC, 364 F. Supp. 3d 63,

86 (D. Mass. 2019) (quoting 29 C.F.R. § 541.500(a)).[13]  "The outside salesman exemption was

designed 'to address the incompatibility of wage and hour requirements with the individual

character of the job performed by a salesperson who works without time restrictions and who can

---

[13] "The definition of exempt employees under Massachusetts law . . . mirrors that of the [Fair Labor Standards Act]."  Crowe v. Examworks, Inc., 136 F. Supp. 3d 16, 46 (D. Mass. 2015).

As Plaintiff notes, his home office counts as "the employer's place of business" for purposes of the test.  29 C.F.R. § 541.502 ("any fixed site, whether home or office, used by a salesperson as a headquarters or for telephonic solicitation of sales is considered one of the employer's places of business, even though the employer is not in any formal sense the owner or tenant of the property").

earn as much or as little as his ability and ambition dictate.'" Id. (quoting Miranda-Albino v. Ferrero, Inc., 455 F. Supp. 2d 66, 73 (D.P.R. 2006)).

Only the second prong is in dispute here.  Federal regulation explains that: "[t]he phrase 'customarily and regularly' means a frequency that must be greater than occasional but which, of course, may be less than constant.  Tasks or work performed 'customarily and regularly' includes work normally and recurrently performed every workweek; it does not include isolated or one-time tasks."  29 C.F.R. § 541.701; see, e.g., Weingarten v. Wells Fargo Bank, N.A., No. 16-cv-12380, 2018 WL 2163646, at *1 (D. Mass. Jan. 30, 2018) ("[A]n employee can satisfy the 'customarily and regularly' requirement by performing sales-related activity outside the office 'one or two hours a day, one or two times a week.'"); Washington-Hughes v. PALMco Power MA, LLC, No. 2018-cv-01665, 2020 WL 4607588, at *2 (Mass. Super. June 5, 2020) ("[S]everal federal district courts have ruled that an employee need not spend all, or even a majority of, his time outside the office for the exemption to apply.").  Moreover, any work that Plaintiff performed at home that is "incidental to and in conjunction with the employee's own outside sales or solicitation" would still count as exempt work.  Weingarten, 2018 WL 2163646, at *1) (quoting 29 C.F.R. § 541.500(a)).

Defendants point to evidence in the record that Plaintiff spent roughly five percent of his time traveling to conferences to perform critical sales duties; that he repeatedly emphasized the importance of these conferences to his sales work; and that his work from home was in conjunction with his outside sales or solicitation.  [ECF No. 41 at 12–15].  Plaintiff, in turn, points to evidence that he traveled to conferences only four times a year; that much of the work he performed at home was unrelated to the business generated at those conferences; and that for

the vast majority of workweeks, Plaintiff had zero outside sales activity.  [ECF No. 43 at 9–10].

Because of this conflicting evidence, the motion for summary judgment is denied.[14]

2.   Administrative Exemption

Defendants' additional argument that Plaintiff also fell within the administrative

exemption has thin record support.  To meet their burden on this exemption, Defendants must

show that (1) Plaintiff's primary duty was "the performance of office or non-manual work

directly related to the management or general business operations of the employer or the

employer's customers" and (2) this duty included "the exercise of discretion and independent

judgment with respect to matters of significance."  29 C.F.R. § 541.200(a)(2), (3); see also Hines

v. State Room, Inc., 665 F.3d 235, 242 (1st Cir. 2011).

> The phrase 'directly related to the management or general business operations'
> refers to the type of work performed by the employee. To meet this requirement,
> an employee must perform work directly related to assisting with the running or
> servicing of the business, as distinguished, for example, from working on a
> manufacturing production line or selling a product in a retail or service
> establishment.

---

[14] Defendants cite to a few cases to argue that summary judgment is warranted on these facts as a
matter of law, but none are persuasive.  In Weingarten, plaintiffs met the 'customarily and
regularly' requirement where they regularly attended open houses during the work week, had
outside meetings anywhere from one to ten times a week, and attended networking activities on
weekly or biweekly bases.  2018 WL 2163646, at *1.  In Washington-Hughes, the plaintiffs were
exclusively "door-to-door sales representatives" who had no additional regular duties.  2020 WL
4607588, at *2.  Defendants highlight Lint v. Nw. Mut. Life Ins. Co., No. 09-cv-1373, 2010 WL
4809604 (S.D. Cal. Nov. 19, 2010), but Lint is a non-binding case that is factually distinct.
There, the court granted an unopposed motion for summary judgment on plaintiff's qualification
under the outside sales exemption where defendant presented evidence that "10-20 percent of his
time was spent meeting with clients or prospective clients outside" and "[w]hen he first started in
the business, he would see approximately 50 clients per week and would drive approximately
4,000 miles each month in doing so."  Id. at *3. Defendants suggest Plaintiff had also previously
traveled a comparable amount, but merely point to vague testimony about his past work for an
entirely different company.  [ECF No. 48; ECF No. 48-2 at 45:11–17.]

Hines, 665 F.3d at 242 (quoting 29 C.F.R. § 541.201(a)).  For example, "an employee whose primary duty is selling financial products does not qualify for the administrative exemption."  29 C.F.R. § 541.203(b).  Further, the "[d]etermination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole."  29 C.F.R. § 541.700.

Defendants have not pointed to any evidence in the record or case law that would support a finding, at this stage, that Plaintiff performed work "directly related to assisting with the running of the business[.]"  Indeed, the record is replete with Defendants' own admissions that Plaintiff's primary duty was sales.  That Plaintiff may have had "some tasks" that "could fall" under this exemption, [ECF No. 48 at 11], does not come close to the showing needed to warrant summary judgment in Defendants' favor, cf. Hines, 665 F.3d at 242 (finding plaintiffs fell within this exemption because they "were focused on more than simple individual sales transactions" and "the sales managers' own testimony indicate[d] that they did not simply close contracts. Instead, they worked with each client to create a custom [banquet] event in all of the particulars").  Having concluded that Defendants have failed to meet their burden on the first prong, the Court need not move onto the second.

### B.   Proof of Overtime Hours

Defendants' remaining argument that they are entitled to summary judgment because Plaintiff has not proven the amount of overtime hours worked sufficient to proceed with his claim is unavailing.  [ECF No. 41 at 22–24].

"Under Massachusetts law, it is an employer's duty to maintain time records for its employees."  St. Pierre v. CVS Pharmacy, Inc., 265 F. Supp. 3d 131, 139 (D. Mass. 2017) (citing Mass. Gen. Laws c. 151, § 15).  Only if the employer fails to keep adequate records does the

burden shift to the employee.  Donis v. Am. Waste Servs., LLC, 125 N.E.3d 759, 769–70 (Mass. 2019), aff'd in part, rev'd in part, 149 N.E.3d 361 (Mass. 2020).  In Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680 (1946), the Supreme Court articulated a two-part standard for allowing employees to recover approximate damages arising from unpaid wages "where the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes . . . ." Id. at 687.

Under Anderson, the "employee must prove 1) that he 'performed work for which he was improperly compensated,' and 2) produce 'sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.'" St. Pierre, 265 F. Supp. 3d 131, 140 (D. Mass. 2017) (quoting Anderson, 328 U.S. at 687).  An employer must "rebut with precise data, or otherwise negate the reasonableness of the inference" or a court can award damages, "even though the result be only approximate."  Id. (quoting Anderson, 328 U.S. at 688); see also Donis, 125 N.E.3d at 770 ("The [Anderson] framework is designed to benefit employees, not employers -- that is, to ensure that employees are not 'penalize[d]' for their inability 'to prove the precise extent of uncompensated work' because of the 'employer's failure to keep proper records.'") (second alteration in original).

Courts have further explained that "[t]he employee's initial burden of proof is 'minimal,' though 'not nonexistent[]'" and "[t]he employee can satisfy the burden through 'estimates based on his own recollection.'"  Pineda v. Skinner Servs., No. 16-cv-12217, 2020 WL 5775160, at *16 (D. Mass. Sep. 28, 2020) (citation omitted).  "Courts have routinely found that plaintiffs' testimony estimating their daily or weekly uncompensated hours and explaining the basis for their estimates is sufficient to meet their initial burden of proof, especially at the summary judgment stage."  Id.

22

Plaintiff claims that he worked 50 hours a week and has offered sworn testimony about the basis for his estimate, [ECF No. 43 at 16], which is sufficient to satisfy his lenient burden, and Defendants have not rebutted his data or offered any evidence to challenge the reasonableness of his estimation.

## V.      CONCLUSION

For these reasons, Plaintiff's motion for summary judgment, [ECF No. 38], and Defendants' motion for summary judgment, [ECF No. 40], are both <u>DENIED</u>.  The parties are to appear for a status conference before the Court on October 12, 2022 at 9:30 a.m.

**SO ORDERED.**

September 30, 2022                                              /s/ Allison D. Burroughs
                                                                       ALLISON D. BURROUGHS
                                                                       U.S. DISTRICT JUDGE